FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 JUL 27 ...

U.S. DISTRICT COURT
N.D. OF ALABAMA

JONATHAN D. WYNN,               )
                                )
        Plaintiff,              )
                                )
    vs.                         )        CV 99-BU-2989-S
                                )
HELIG-MEYERS   FURNITURE        )        **ENTERED**
COMPANY, INC.,                  )
                                )        JUL 27 2000
        Defendant.             )

---

## MEMORANDUM OPINION

---

## I.   **INTRODUCTION**

Plaintiff Jonathan D. Wynn has sued his former employer, Defendant Heilig-Meyers

Furniture Company.  Plaintiff alleges that he suffered certain adverse employment actions

in retaliation for complaining about Defendant cutting employees' overtime; that he suffered

certain adverse employment actions in retaliation for complaining about and/or refusing to

participate in race discrimination; that Defendant's conduct constituted negligence and/or

wantonness; that Defendant negligently and/or wantonly employed, trained, supervised,

and/or retained the employees that harmed Plaintiff; that Defendant ratified the conduct of

the offending employees; and that Defendant breached a contract with Plaintiff to provide

him with a working environment free of discrimination and retaliation.

Defendant has filed a Motion for Summary Judgment (Doc. 36) and Plaintiff has filed

a Motion for Partial Summary Judgment on his retaliatory termination claims.  (Doc. 41)
With its Reply Submission Defendant filed a Motion to Strike the Declaration of Regina
McGuire (Doc. 53), offered by Plaintiff in opposition to Defendant's Motion for Summary
Judgment.  The Court, having reviewed the record and the parties' submissions, finds that
Defendant's Motion to Strike the Declaration of Regina McGuire is due to granted in part
and denied in part; that Defendant's Motion for Summary Judgment is due to be granted
 and all Plaintiff's claims are due to be dismissed; and the Plaintiff's Motion for Partial
Summary Judgment is due to be denied as moot.

## II.     **SUMMARY JUDGMENT STANDARD**

Summary judgment provides the parties an opportunity to test the mettle of a case
before it ever reaches trial.  On a motion for summary judgment, the court assesses all of
the proof the parties bring to bear in order to ascertain whether there is a genuine need for
a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct.
1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963
Amendment to Fed. R. Civ. P. 56(e)).  Summary judgment is appropriate only if the court
concludes that no genuine issue of material fact exists and that the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing this
court of the grounds for its motion and specifically identifying those portions of the
pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits

that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477

U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

1991). The moving party's burden is not meager; it must illuminate for the court the

reasons why the nonmoving party cannot or does not raise a genuine issue of material fact

sufficient to support a trial. *Id*. The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, *by reference to materials on file*, that there are no genuine issues of material fact that should be decided at trial. *Only* when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. *Even after Celotex it is never enough to simply state that the non-moving party cannot meet its burden at trial*.

*Id*. (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54)(emphasis added)[1]

Once the moving party has satisfied this initial burden, however, the nonmoving

party "must make a sufficient showing to establish the existence of each essential element

to that party's case, and on which that party will bear the burden of proof at trial." *Howard*

*v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the

---

[1]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id*. at 607. Obviously, this case does not fall into the "uncommon situation" addressed in *Celotex*. *See* Def. Brief, p. 14.

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing *Carter*

*v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## III.   **STATEMENT OF FACTS**

Plaintiff Jonathan Wynn began working for Defendant Heilig-Meyers in 1992 as an outside collector at its Decatur, Alabama store. Defendant later promoted him to Credit Manager. As Credit Manager, Plaintiff was responsible for overseeing the extension of credit to customers and the collection of payments on customer accounts; he supervised cashiers, credit extenders, and collectors.

Plaintiff's immediate supervisor was Don Dutton, the Decatur store manager, who in turn reported to Glen Pruitt, the divisional supervisor. In 1994, Plaintiff, in a letter to Pruitt, accused Dutton of discriminatory behavior and conduct toward black employees and customers. Plaintiff does not claim that he was retaliated against as a result of this letter. Shortly thereafter, Defendant promoted Plaintiff to the store manager position at its Pell City store. However, in 1996, Plaintiff resigned for reasons not at issue in this case.

After working for several employers for short periods of time, Plaintiff reapplied with Defendant in September 1997.

On his application Plaintiff marked the box "no" in response to the question, "Have you ever been convicted of a crime." However, Plaintiff was convicted of attempted burglary in 1992, while employed at the Decatur store.

On December 10, 1992, Plaintiff had been caught taking merchandise from a storage building in Decatur. The affidavit attached to Plaintiff's arrest warrant states that a police officer had found Plaintiff hiding in the bushes behind the building at 3:15 a.m. Further, the affidavit states that Plaintiff admitted to taking "approximately 60 watches, a

[h]utch, a [t]iming [l]ight, a Dwell Meter and some children's clothing" from the building. Doc. 38, Exh. 1, exh. 15. Plaintiff was charged with burglary in the third degree and, on April 11, 1994, he entered a plea of guilty to attempted burglary, a misdemeanor.

Plaintiff contends that he answered "no" to the question about any criminal convictions because he mistakenly believed that Defendant was only interested in felony convictions and he had plead guilty to a misdemeanor. Moreover, he contends, prior to his 1997 application, he had informed several of Defendant's employees, including Doug Moore, store manager at Decatur at the time of his arrest; Steve Cash, a divisional supervisor; Glenn Pruitt, a divisional supervisor; and Jim Glover, a regional vice-president.

Defendant rehired Plaintiff as a sales person at its Decatur, Alabama store in September 1997. Within a month, he was promoted to the Credit Manager position at the Huntsville store. His immediate supervisor at the Huntsville store was Brian Cason. In the Spring of 1998, Randy Ertzberger became the district supervisor over the Huntsville store.

A few months after his promotion, Plaintiff reported to Defendant, through a confidential employee hotline, that he suspected Cason of theft and mismanagement of funds. A store-wide investigation was conducted and Defendant removed Cason from his position. Plaintiff alleges that Ertzberger threatened him with termination for his knowledge and/or involvement in the theft and mismanagement of funds. However, Plaintiff submitted proof that he had reported the theft through the confidential hotline and he was not terminated.

Defendant named Ricky Mitchell as the new store manager. At this time, the Huntsville store was losing money and there was a lot of theft by employees. Mitchell and

Ertzberger suspected that a theft ring was operating at the store. They suspected Thomas

Jones, the collection manager and Plaintiff's subordinate, of being involved in that ring.

Although unknown to management at the time, Jones had spent years in prison for armed

robbery, robbery, and cocaine possession and/or trafficking.

Throughout 1998, Plaintiff and Jones regularly socialized after working hours. On

October 21, 1998, Mitchell prepared an employee warning form, which stated:

> Fraternizing with fellow employee. I talked to Mr. Wynn a couple of nights
> ago about going out to have a drink with another employee. I explained
> must invite everyone, not just one. On 10-20-98, I was told that Mr. Wynn
> and Mr. Jones were at a bar drinking. I asked Mr. Wynn, and he said he did
> not invite Mr. Jones. He was already at the bar, and the other employee
> came into the bar. Mr. Wynn was alone.

> Action Taken:  Explain to Mr. Wynn do not invite just one individual, must
> invite all.

Doc. 38, Exh. 2, pp. 226-27 & exh. 3. Plaintiff alleges that Mitchell cautioned him not to

socialize with Jones because Jones is black.

In July 1998, Jones abruptly left town to go to Florida because his brother had

murdered the father of his girlfriend. Before he left, Jones told Plaintiff that he probably

was going to quit. After Jones was gone for several days, Mitchell completed and sent in

paperwork reflecting the fact that Jones had resigned.  Thereafter, Jones contacted

Plaintiff about returning to work and Plaintiff told Mitchell. At this time, Mitchell told Plaintiff

that he had already processed Jones's separation papers.    Plaintiff told Ertzberger and

Mitchell that he believed that Jones' separation papers were processed for discriminatory

reasons. Immediately, Plaintiff began trying to get Jones rehired.

While Jones was away, a customer had told Plaintiff that Jones had attempted to

sell her a big screen television at a reduced price in exchange for the payments being made directly to Jones. However, despite this information, Ertzberger authorized Plaintiff to rehire Jones. Ertzberger told Plaintiff that, if it were his decision, he would not rehire Jones. Ertzberger also suggested that rehiring Jones could adversely affect Plaintiff's career because Jones, as Collection Manager, was second in command in the Credit Department and reported directly to Plaintiff. Plaintiff decided to rehire Jones and neither Ertzberger nor Mitchell overrode his decision.

Plaintiff claims that he told Ertzberger and Mitchell that he believed Defendant's decision to terminate Jones in July 1998 was race based. Plaintiff alleges that Ertzberger had directed him to "hire pretty white girls at the front counter" and to "lighten up his staff," but that he refused to comply and voiced his objections. Also during the time he was at the Huntsville store, Plaintiff complained that Defendant discriminated in its advertising by placing more ads on "white" stations than on "black" stations and by emphasizing payments, versus total price, and low-end merchandise in its print ads that were sent to predominately black neighborhoods.

In December 1998, Mitchell terminated Jones again. This time, Jones was terminated for lying to a creditor, who was trying to garnish another employee, by telling the creditor that the employee was on leave. Plaintiff told Mitchell he did not agree with the decision to terminate Jones. He thought Jones should have been counseled.

Ertzberger told Plaintiff that he would transfer him to another store in his division as store manager. Plaintiff told Ertzberger, however, that he was not interested in having his own store, "much less one under his supervision." Several times between the Summer of

1998 and  January 1999, Plaintiff told Mitchell that he wanted to transfer to a store outside

of Ertzberger's division.  He told Mitchell that he would move anywhere and that he did not

care where.  Plaintiff also informed Pruitt, his former district supervisor, that he wanted to

transfer to another store.  However, Plaintiff contends that he never formally "requested"

a transfer.

Mitchell told Plaintiff that he would try to help him and, in fact, Mitchell found an

opening for a credit manager position at Defendant's Evansville, Indiana store, which was

not in Ertzberger's division.  Mitchell told Plaintiff that if he did not take the job in Evansville

that he believed Ertzberger would fire Plaintiff.

The Evansville store was a troubled store.  Mitchell told Plaintiff that he could go to

Evansville for six months, get the store "straightened out," and, then, he would have the

opportunity to transfer back to a store in Alabama.  Plaintiff had, to this point, been very

successful at going in and fixing troubled stores; he had the reputation for being someone

who was good with numbers and could turn around troubled stores.  Mitchell told Plaintiff

that, if he liked Indiana, Defendant would find a position for his wife, who also worked for

Heilig-Meyers.  Plaintiff testified that he believes that he was forced to transfer through a

conspiracy between Mitchell and Steve Barnett, the district supervisor over the Evansville

store.  Plaintiff testified that he has no knowledge that Barnett knew about any of his

complaints about race discrimination at the time of the transfer.  Plaintiff believes that, as

a favor to Mitchell, Barnett had agreed to accept Plaintiff in the Evansville store, which,

Plaintiff contends, was already slated to be closed, as part of a plan to get rid of Plaintiff.

When asked on what he based this belief, Plaintiff testified:

Well, because I didn't lay down for everything. I would stand up. I wasn't the easiest person to fire like they had been doing with the black people. I wouldn't just take their answers for this or that and let it go. I was confrontational on issues that weren't within the law and weren't within Heilig-Meyers's policy. So, therefore, I wasn't an easy target just to come in and fire and say, well, you showed up late for work and we're going to fire you.

And I felt like with Steve Barnett – I know now, Steve Barnett and Ricky Mitchell have worked together and are personal friends. They take vacations together and such, and in my opinion, could have been a favor to Ricky to get me up there so he wouldn't have to deal with it, close the store, and end of Jonathan [Plaintiff].

Doc. 38, Exh. 1, pp. 122-23. He also testified that he believed the incidents that happened

after he transferred and up to his termination support his belief regarding a conspiracy.

Plaintiff transferred to Evansville in January 1999. At the time of his transfer,

Mitchell placed the following memorandum in Plaintiff's personnel file:

Jonathan Wynn has [come] to me on numerous occasions, requesting transfer. Said he was burnt out on this pace – wanted to move anywhere didn't care where. I said I would try to help him. I ask Mr. Ertzberger about getting Mr. Wynn transferred. He said O.K., if he wants to go. I called Steve Barnett, supervisor of the Rams Division. He said as soon as he got an opening. I called Steve Barnett on many occasions. I told Steve Barnett [that] I thought Mr. Wynn would be an asset to him. Mr. Wynn did not agree with Mr. Ertzberger on credit and I think [this] may be some of the reason. But then Mr. Wynn told me he was getting separated from his wife, because she didn't want to help raise, and his wife was bouncing checks.

Doc. 38, Exh. 1, exh. 3. Plaintiff contends that the statements regarding his wife were not

true.

Plaintiff considered the transfer to Evansville to be a lateral transfer and he received

a raise from $28,600 a year to $30,000 a year. Plaintiff understood that his role was to

help fix the store financially and to help train the new store manager, Amy Parrent. Plaintiff

went to Evansville voluntarily because he believed the transfer was a good faith offer.

Plaintiff worked at the Evansville store less than two weeks – from January 4, 1999 until January 16, 1999. Immediately after he arrived, Plaintiff began attempting to uncover various Heilig-Meyers policy violations. Plaintiff called Mitchell and asked him if he thought Barnett was the kind of person who would play with numbers. Plaintiff drafted a letter to Barnett and Jason Burdette, the regional assistant supervisor, which listed "serious violations of Company policy." Doc. 38, Exh. 1, exh. 4. He indirectly accused Parrent and her assistant manager of embezzling money. Plaintiff also implied that Barnett was manipulating the numbers.

He gave the letter to Burdette on or about January 10, 1999. Burdette read through the memo and gave it back to Plaintiff. Plaintiff then gave a copy to Barnett. He expected Barnett to take some kind of action regarding his report, such as an investigation and/or an audit. Instead Barnett told Plaintiff "that [he] shouldn't be digging and that [he should] focus on sales and not to worry about these problems because the store was listed to close." Doc. 38, Exh. 1 at p. 147.

Approximately one week later, on Friday January 15, 1999, Defendant paid Plaintiff $1,000.00 for relocation expenses. The next day, Plaintiff left a note for Parrent that said, simply, "Gone Home;" he left his store keys next to the note. On Saturday morning, Parrent found the keys and the note. Plaintiff called Parrent that evening. She asked him if he had quit; he said that he had not, but he needed to speak with Barnett before he returned to work. He testified that he told Parrent that he would try to call Barnett at home and, if he could not get him, he would see Parrent Monday.

On Monday, January 18, Plaintiff did not report to work. He called Barnett and they agreed that Plaintiff could not continue working in Indiana.  Plaintiff wanted to find a job with Heilig-Meyers in Pruitt's division in Alabama.  Barnett allegedly offered Plaintiff "three or four days" to get in touch with Pruitt and locate a job in Alabama, and if he found one within that time period, Barnett would transfer him.

Plaintiff testified that he had difficulty getting in touch with Pruitt within the three to four day time frame.  Three days later, on January 21st, Plaintiff became concerned that the "three or four days that Steve Barnett had given [him] were about to expire and [he] still hadn't gotten in touch with Mr. Pruitt at that point."  Doc. 38, Exh. 1 at p. 209.  Plaintiff faxed a letter to Roy Page and Gerald Gay, two area vice presidents, asking for their assistance in finding a job in Alabama and complaining about discrimination that he had allegedly observed at the Huntsville store before working in Indiana.  This was Plaintiff's first formal complaint about the Huntsville store and Plaintiff's first complaint to anyone outside of the Huntsville store about perceived discrimination.  After this letter, Plaintiff began keeping detailed notes of his conversations with Heilig-Meyers management.

Page called Plaintiff at home after receiving his letter.  During this conversation, Plaintiff admitted to Page that he could have handled leaving Evansville better. Nevertheless, Page told Plaintiff that he was a good credit manager and that Defendant needed him.  He agreed to help Plaintiff locate a job in Alabama.  Page contacted Pruitt and recruited him to help find Plaintiff a job in Alabama.  Plaintiff also talked to Pruitt and Pruitt agreed to help Plaintiff locate a job in his division.

The next week, Pruitt told Plaintiff that there was an available Credit Manager

position in the Bessemer, Alabama store and to go interview with the store manager. On January 26, Plaintiff interviewed with the store manager of the Bessemer store, Bob Berry. Berry agreed to hire Plaintiff. The existing credit manager was demoted and Plaintiff was hired as the credit manager for the Bessemer store. Despite the fact that the Bessemer store was a much smaller volume store than Huntsville and given that Defendant pays its credit managers according to the volume of their store, Plaintiff was paid the same annual salary that he had earned at the Huntsville store, $28,000 per year. Plaintiff planned to start work in Bessemer the following Monday, February 1, 1999. In finalizing this move, Pruitt discovered that paperwork reflecting that Plaintiff had resigned his position in Evansville had already been processed by the corporate office. Under Heilig-Meyers' policy, the approval of the regional vice president must be obtained before the rehire of any management employee. At the time, Jim Glover, the regional vice president over the Bessemer store and the person who needed to authorize Plaintiff's reinstatement, was in Hawaii. Pruitt, who was to meet Glover in Hawaii, agreed to get his authorization and finalize things when he returned.

Within a few days of Pruitt's return, Plaintiff was approved for rehire at the Bessemer Alabama store. Pruitt told Berry to reinstate, rather than re-hire, Plaintiff so he would not lose his years of service with Defendant.

Plaintiff began working at the Bessemer store on Monday February 15, 1999. Management employees at the Bessemer store were paid every two weeks. The first pay period ended four days after Plaintiff arrived at the Bessemer store. On March 5, 1999, the end of the first full pay period worked by Plaintiff, he received his first paycheck from

the Bessemer store.  On that day, but before he received his check, Plaintiff wrote a letter

to Berry, the store manager, complaining that he had not yet received a paycheck and that

he believed he was a victim of "a hostile effort by corporate officers to rid [him] of [his]

employment."    Doc. 38, Exh. 1, exh. 7. In addition, he accused eight corporate

officers/agents of lying to him.  Berry called the home office and asked payroll to look into

the problem.

On March 24, 1999, Plaintiff filed a charge of discrimination with the EEOC.  His

charge stated:

> My name is Jonathan D. Wynn, a white man.  I have been a career manager
> for Helig Meyers Furniture Co. and have been with the company for
> approximately 7 years.  During my employment I have witnessed wide
> spread discrimination against black employees.
>
> In October, 1998, I rehired a black employee who had been terminated in
> July because as a black man he was not trusted.  Randy Ertzberger, Division
> Supervisor, advised me that although I had the autonomy to rehire him, he
> would not do it.  He told me if I did so it would affect my career.
>
> Mr. Ertzberger told me I should get on his team to succeed with the
> company.  he told me that by associating with niggers that I was asking for
> trouble, especially hanging out after hours with Thomas Jones.  He told me
> I was prohibited from associating with him.  He said that where he was from
> they (blacks) could not walk down the street at night.
>
> I was told repeatedly by Mr. Ertzberger and Ricky Mitchell -- Store Manager
> -- that I should "lighten up" my staff, because it was too "ethnic."  I was
> instructed to hire pretty white girls, so that we could entice a better customer
> base.  I was also instructed by Ricky Mitchell, not to advertise with our local
> radio station, WEUP, because it was a black radio station, and would bring
> in the bad customers that we were trying to avoid.
>
> After I refused to follow these tactics, and after hiring another black lady as
> office manager, I was retaliated against.  I was subject to countless
> investigations, that were subsequently proven to be bogus.  I was threatened
> with criminal prosecution in a formal report that was also proven to be bogus.

I was denied my full bonus, even though my manager received his full bonus, and out bonuses are based on the exact same criteria.

I was then forced to transfer to another location in Indiana. I was told by Ricky Mitchell that if I did not take the transfer, that Randy Ertzberger was going to fire me. After arriving in Indiana, I was told by Steve Barnett, Division Supervisor, that the store I was now in was on the list to close. He and I could not agree on how to straighten out the store and he agreed to transfer me back to Alabama.

I then made a formal report to the Regional Vice Presidents, Mr. Roy Page and Mr. Gerald Gay. In my report, I complained about the discrimination and the retaliation of my refusal to participate in the discrimination. After they received my report on January 21, 1999, I was then fired.

After fighting back and forth with the company about my job and my pay, for the past two months, I was then told that they would rehire me but could only rehire me at a lower salary and the only thing available was in Bessemer. As I needed a job, I took it despite the fact that I have to drive 200 miles a day, round trip, to work here at a lower salary.

Still the retaliation, humiliation, and hostility persists. [I have been denied my weekly pay for three weeks after returning to work,] until I wrote a letter demanding my pay. I have been subjected to the same treatment that they have unjustly served among my black colleagues.

Doc. 38, Exh. 1, exh. 1.  The charge was submitted through the NAACP.

Plaintiff contacted Allen Deane in Human Resources of Heilig-Meyers concerning various pay discrepancies. In turn, Deane recruited the help of various individuals in the payroll records and bonus departments, who were qualified to address the problem, to help Plaintiff. Payroll and bonus payments were administered by specific departments at the home office in Richmond, Virginia. Plaintiff was paid for all the time he worked; however, he did not receive his bonus, which he calculated to be $21.16.

On May 20, 1999, three months into his employment in Bessemer, Plaintiff filed a second EEOC charge. This charge, which was also submitted through the NAACP, states:

In March 1999, I filed a complaint naming discriminatory actions by my employer. Since my filing I have experienced continued and accelerated retaliation.

Since my complaint Heilig Meyers has refused to pay my annual bonus which was paid to all other qualifying managers. Upon their refusal, their reasons have ranged from "it was overlooked due to the transfer," and "not qualified due to termination," to "the store did not earn a bonus," all of which are untrue. My bonus was not given due to the fact that I have stood against discrimination in our workplace, and because of my complaint filed with the EEOC.

Other retaliation has taken place in form of withholding my pay some of which is still owed to me. I have followed all avenues laid out by company policy to get my check corrected and no one will take care of the problem, nor pay me my wages earned.

Racial comments have been directed toward me from my supervisor, Bob Berry, in an effort of intimidation.

My insurance was canceled by corporate officers, again in retaliation. After several attempts, they have reinstated my insurance.

Their constant efforts of hostility and retaliation have been almost unbearable in an attempt to make me quit my job.

All as a result of my EEOC complaint, and the contents of that complain. [sic] I have been unfairly treated because of my association and anti-discriminatory actions with blacks.

Doc. 38, Exh. 1, exh. 23.

Also in May 1999, Plaintiff left on an extended paid sick leave for stress. He was

off work on sick leave for six weeks.

Plaintiff testified in his deposition that Berry purposefully retaliated against him and

intimidated him because of his support for Defendant's black employees. He stated:

[W]hen I first came [to the Bessemer store], he repeatedly told me he was glad to have a white man in the office with him. Considering my claim, I felt that [was] offensive. He inferred to me through that statement he

Page 16 of 34

wanted me to act like a white man and not stand up for the black community or the black employees of that store, and that was repeated quite often and especially the first several weeks I was there.

He asked me to fire some black employees, again, relating to some of the claims that I made, because he did not trust them. . . . I refused to do so based on [the fact that] I had no knowledge of these employees or what they did or did not do. He eventually fired Renee Woods himself while I was in the breakroom with him and [the] white warehouse manager. [The warehouse manager] asked him why he fired Renee and he looked at me and said because she was black and that was the only statement he made. . . . I confronted him about the situations with the way he treated our black employees in our warehouse. He told me he didn't trust them. He didn't want to follow company policy about CODs because . . . he said the whole warehouse was black and therefore he wasn't going to . . . let them pick up any money.

Doc. 38, Exh. 1, pp. 311-12.

Jones filed a charge of discrimination relating to his termination. In May 1999, Defendant took statements from two black employees – LaToya Fletcher and Donna Battle. Both employees stated that Wynn showed favoritism to some employees. The record also contains a second statement from Fletcher, the date of which is unclear. In this statement, which is unsworn, Fletcher states and Wynn and several black employees from the Huntsville store, have called her and asked for her help with "this lawsuit." Doc. 39, Exh. 4, exh. 38. She states that she told them she did not wish to be involved in their lawsuit.

In June 1999, the last in a series of burglaries took place at the Huntsville, Alabama store. During this time period, Mitchell told Deane that he had looked for criminal records on employees at the Huntsville store. Mitchell later called Deane and told him that he had

found that Plaintiff had a criminal record.[2]  Deane asked an attorney in Virginia, where Deane's office was located, "to make sure that they would authenticate anything or just basically review [Mitchell's] practices to make sure what he found was what he found." Doc. 39, Exh. 4, pp. 42-43.  The records were requested and, on June 29, 1999, a copy of these records was certified by the Clerk of the Morgan County Court.  The records included the case action summary sheet, the warrant with accompanying affidavit, and Plaintiff's guilty plea.  Within a few days, Deane received and reviewed copies of Plaintiff's criminal records.  When he received the records, Deane also pulled Plaintiff's 1997 employment application and saw that he had not indicated that he had a criminal conviction.  Deane asserts that he decided at this time to terminate Plaintiff "because [he] had lied on his application."  Doc. 40, Exh. 11 ¶ 8.  Plaintiff was still off work on sick leave at this time.

Deane states that he notified Berry and Pruitt of his findings and his decision to terminate Plaintiff.  Although Plaintiff disputes this fact, Berry states in a declaration submitted in support of Defendant's motion that Deane told him that he would be sending Plaintiff a letter terminating him on the basis of the falsified application, and neither Berry nor Pruitt were asked during their depositions if Deane had told them prior to July 7, 1999 (the date Plaintiff returned from sick leave) that he had decided to terminate Plaintiff.

---

[2]Plaintiff disputes that Mitchell told Deane about Plaintiff's record based on Mitchell's deposition testimony, given during Jones's lawsuit, to the effect that he did not participate in the investigation of "theft" at the Huntsville store.  Given that the evidence is undisputed that Deane requested and received a copy of Plaintiff's case action summary sheet, which was certified on June 29, 1999, the Court finds that Mitchell's prior testimony that he did not investigate theft is not substantial evidence of a disputed issue of material fact.

Deane told Berry that he would be sending Plaintiff a letter informing him of his termination.

On July 7, 1999, Plaintiff returned from sick leave; Berry was not at work that day. The next morning, July 8, Plaintiff went to Berry's office with a list of demands. This was the first time that Plaintiff had seen Berry since Plaintiff had returned from sick leave. Plaintiff came in to Berry's office and accused him of violating Defendant's policy by permitting casual warehouse laborers to work more than eight hours within a ninety-day period without being placed on the payroll and by paying such workers out of petty cash. Plaintiff presented Berry with a list of such employees that he had gathered from his review of the petty cash voucher book. Also during this meeting, Plaintiff accused Berry of illegally tampering with overtime hours and other illegal activities. He also accused Berry of manipulating overtime on the basis of race. He told Berry that he had gathered documentation in support of those accusations. He announced that certain things at the store were going to stop. Berry asked Plaintiff what he was talking about; Plaintiff responded that Berry knew very well what he was talking about. The meeting was confrontational. Berry denied any wrongdoing and became very defensive. Berry believed that Plaintiff was calling him a liar.

Plaintiff told Berry that he was going to report these matters. Berry did not ask Plaintiff to whom he was going to report these matters. Berry testified that it did not matter to him because "[n]othing that Mr. Wynn reported or accused me of would surprise me , so it wasn't relevant to me who he might try to report it to." Doc. 38, Exh. 3, pp. 84-85. Plaintiff also told Berry that the sign on the store does not say "Bob Berry Furniture," but rather "Heilig-Meyers Furniture." Berry asked if Plaintiff was on a "search-and-destroy"

mission; Plaintiff responded that, in a sense, he was because he was going to get Berry and the other stores to quit doing the things that Plaintiff believed were in violation of company policy and the law.

After about five minutes, Berry told Plaintiff he needed to pack up his personal things and go somewhere else. Plaintiff said that he would see Berry in court and demanded payment for the day and a half that he had worked since returning from sick leave.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff contends that Berry had terminated him at the end of this confrontation. Plaintiff testified that Berry took these accusations very personally, although Plaintiff does not believe Berry should have taken the accusations personally because Berry should have expected it. Plaintiff reported to the unemployment compensation board that "Bob Berry, manager, fired me because he could no longer work with me."

Deane completed a form indicating Plaintiff's termination on July 8, 1999. He also sent Plaintiff a letter informing him of his termination; the letter was dated July 8, 1999, via Federal Express. The letter states that Plaintiff is being terminated, effective July 8, 1999, for falsifying his employment application by failing to indicate that he had a criminal conviction. The letter states, "[S]uch misrepresentation is intolerable for a management employee. Therefore, Heilig -Meyers must terminate your employment at this time." Doc. 39, Exh. 4, exh. 44. The letter indicates that a copy was sent to Berry and Pruitt. Berry received his copy on July 9, 1999.

Although the letter contained Plaintiff's correct address (he had recently moved), the

Federal Express package was addressed to Plaintiff's former address.  The package was returned to Deane around the end of July and apparently had been opened; there is no evidence showing when the package was opened or who opened it..  The letter was sent to Plaintiff's correct address on August 10, 1999; the letter was also returned to Defendant, although not to Deane.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff has submitted the declaration of Regina McGuire.  McGuire was questioned, under oath, after she was terminated.  She contends in her declaration that Defendant's lawyers "kept turning the tape recorder on and off.  They only wanted parts.  It left a distorted picture of what happened."  Doc. 53, Exh. B ¶ 4.[3]

In her declaration, McGuire stated that she was questioned after she quit working for Defendant; however, in her deposition, she testified that she was currently employed with Defendant as assistant credit manager.  In her declaration, McGuire stated, "I worked closely with [Plaintiff] and saw he was under a lot of stress.  Mr. Berry upset Mr. Wynn almost daily by refusing to back him with employees, shooting down what he was trying to do, or by making some comment to him.  This made his job much harder."  However, in her deposition, she testified that Plaintiff did not appear to be stressed and that he had no reason to be stressed.[4]  McGuire testified that Plaintiff told her that Berry did not fire him.

---

[3]The Court notes that the deposition was stopped three times for an off the record discussion.  Doc. 53, Exh. A, pp. 9, 13, & 67.

[4]For example, McGuire testified as follows:

Q.      Did you ever observe any type of mistreatment toward Mr. Wynn?

Moreover, she testified that Plaintiff told her that 'he was fired via a Federal Express

package. . . . [H]e just said they sent a note Federal Express and fired him." Doc. 53,

Exh. A, p. 55. Her declaration does not dispute this fact; it states only:

> I was not there Mr. Wynn's last day. Later Mr. Berry said he told him to
> leave. Later still he told me Mr. Wynn had been terminated. He said they
> found he had been convicted of a crime. This did not seem right. Mr. Berry
> and I both knew of store employees who had been convicted of crimes.

Doc. 53, Exh. B ¶ 3.[5]

At the beginning of her deposition, Defendant's attorney stated, "In case we haven't

made this clear, we don't want anything but the truth from you. That's all we want to hear.

anything bad or anything good, you have to tell us. All we're really here for today is to

discover what it is you know." Doc. 53, Exh. A, p. 7. At the close of her deposition, the

following occurred:

> Q.     . . . [D]o you have anything further that relates to Mr. Wynn's claims
> that we haven't asked you or that hasn't come up?
>
> A.     No. It has basically all been covered.
>
> Q.     Just so the record is clear, you have given this statement voluntarily?
>
> A.     Sure.

---

> A.     No, he had the rule of the roost.
>
> Q.     He pretty much ran the show?
>
> A.     Yes.

Doc. 53, Exh. A, p. 69.

[5]McGuire does not identify any employee that had been convicted of a crime, much
less those that may have been similarly situated to Plaintiff.

Q.     You haven't sensed or felt any pressure from us to say anything other than the truth?

A.     No.

Q.     And you have been honest in your answers?

A.     I have given honest answers to everything.

Doc. 53, Exh. A, pp. 70-71.

On Monday following his termination, Plaintiff began working at North Alabama Transit.


## IV.   DISCUSSION

### A.   RETALIATION[6]

In order to establish a prima facie case of retaliation in violation of Title VII, Plaintiff must establish:  (1) a statutorily protected expression;  (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

Defendant contends that, with the exception of his termination, Plaintiff cannot

---

[6]Defendant contends that Plaintiff does not have standing to raise a claim for retaliation under § 1981 because he has not alleged that he was retaliated against for complaining about race discrimination directed toward him.  The Court notes that the law of the Circuit is not clear as to whether a plaintiff may maintain a § 1981 retaliation claim based on "lawful advocacy of the rights of racial minorities."  *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1410-13 (11th Cir. 1998)(quoting *Pinkard v. Pullman-Standard*, 678 F.2d 1211 (5th Cir. Unit B 1982) and citing, *inter alia*, *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1007 (11th Cir. 1997); *Little v. United Technologies*, 103 F.3d 956, 961 (11th Cir. 1997).  Because this Court finds that Defendant's motion for summary judgment is due to be granted on other grounds, discussion of this issue is pretermitted.

Page 23 of  34

establish that he has suffered any adverse employment action. Whether the particular action at issue constitutes an actionable adverse employment action turns on whether a reasonable person would have found the action to be adverse. The Eleventh Circuit has held that a plaintiff must show that "a reasonable person in [the plaintiff's] position would have found [the job action] to be adverse under all the facts and circumstances. *Doe v. Dekalb County School District*, 145 F.3d 1441, 1453 (11th Cir. 1998). Among the facts and circumstances affecting whether a change in a plaintiff's job is considered "adverse" are changes that result in "lesser pay, responsibilities or prestige," and changes that "involve arduous travel or that impede an employee's professional growth or advancement." *Id*. at 1452.

The fact that the job actions did not effect his title, pay, or benefits is not dispositive of the issue of whether those actions constitute adverse employment actions for purposes of his retaliations claims. "Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the *sine qua non*. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999). However, a plaintiff does not have to prove a "tangible" adverse employment action to prove a claim for illegal retaliation.

> Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As we have made clear in

> *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L.
> Ed. 2d 49 (1986), this language is "not limited to 'economic' or 'tangible'
> discrimination. The phrase 'terms, conditions, or privileges of employment'
> evinces a congressional intent 'to strike at the entire spectrum of disparate
> treatment of men and women' in employment," which includes requiring
> people to work in a discriminatorily hostile or abusive environment.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295

(1993)(quoting *Meritor Savings Bank*, 477 U.S. at 64, 106 S. Ct. at 2404 (quoting *Los*

*Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, 707 n.13, 98 S. Ct.

1370, 1374 n.13, 55 L. Ed. 2d 657 (1978))).  However, "there is some threshold level of

substantiality that must be met for unlawful discrimination to be cognizable under the anti-

retaliation clause."  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.

1998).  The Court finds that the standards for determining whether a particular job action

was adverse is the same for Plaintiff's claims under Title VII, § 1981, and FLSA.

In chronological order, Plaintiff claims the following adverse job actions:

1.      Write-up regarding socializing with Jones;

2.      "Slanderous lies" regarding his reason for transferring to Evansville;

3.      Transfer to Evansville;

4.      Refusal to transfer him back to Huntsville;

5.      Paycheck issues;

6.      Solicitation of negative comments from Battle, Boone, and McGuire;

7.      Hostile work environment due to retaliatory harassment, and

8.      Termination.

Doc. 46, Argument, pp. 1-2.

Except for his unpaid bonus claim and his termination claim, the Court finds that Plaintiff has not shown an adverse employment action sufficient to support a claim for retaliation.

### 1.   Write-up, "Slanderous" Lies, and Solicitation of Negative Comments,

Plaintiff complains that he was written up for socializing with Jones, that "slanderous" lies about his wife and their relationship were placed in his personnel file, and that Defendant solicited negative comments from three of his co-workers. However, Plaintiff has not alleged any repercussion relating to his job that arose from these actions. Under such circumstances, there is no adverse employment action. *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1283-84 (11th Cir. 1999)(citing *Green v. Runyon*, 131 F.3d 151 (10th Cir. 1997)[unpublished]; *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998);[7] *Nelson v. University of Maine System*, 923 F. Supp. 275 (D. Me. 1996); *Rivers v.*

---

[7]In *Sweeney*, the Seventh Circuit Court of Appeals held:

This circuit already has concluded that negative performance evaluations, standing alone, cannot constitute an adverse employment action (but could constitute, under the right circumstances, evidence of discrimination). *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir.1996). The most significantly "adverse" employment actions in this case are the two counseling statements, both of which stop short of disciplining Sweeney but do admonish her to improve. The counseling statements are similar to negative performance evaluations, and arguably less significant. If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit; a simple statutory prohibition against retaliation would be turned into a bizarre measure of extra protection for employees who--though they might genuinely need counseling--at one point complained about their employer. We also would be deterring employers from

*Baltimore Department of Recreation Parks*, 1990 WL 112429, *10 (D. Md. Jan. 9, 1990)).

Therefore, the Court finds that Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's retaliation claims based on the write-up, the "slanderous" lies in his personnel file, and the solicitation of negative comments from co-workers are due to be dismissed.

### 2.     Transfer to Evansville and Refusal to Transfer Back to Huntsville

Based on the "reasonable person" standard, "a *purely* lateral transfer is not an adverse employment action." *Dekalb County School District*, 145 F.3d at 1450 (citing, *inter alia*, *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997); *Kocsis v. Multi-Care Management*, 97 F.3d 876, 886 (6th Cir. 1996)); *see Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). "[T]he voluntary or involuntary nature of the transfer is not relevant to the question of whether it was unlawfully adverse." *Dekalb County School District*, 145 F.3d at 1454. Also, a transfer is not adverse merely because it is a transfer of some distance. *Cf. Eskra v. Provident Life & Accident Insurance* Co., 125 F.3d 1406, 1412 (11th Cir. 1997)(transfer to Pittsburgh from Miami was adverse only because Plaintiff's compensation not guaranteed to be equal to his compensation in Miami), *cited in Greene v. Lowenstein, Inc.*, 2000 WL 775305, *6 [to be published at 99 F. Supp. 2d 1373] (S.D. Fla. Apr. 27,

---

documenting performance difficulties, for fear that they could be sued for doing so. Employees would be left in the dark as to how they could improve their work performance, and employers would be less able to establish the fact that poor performance, rather than some unlawful motivation, prompted a decision to fire, demote, etc.

*Sweeney*, 149 F.3d at 556-57.

2000).

Defendant transferred Plaintiff to Evansville after he asked to be transferred out of Ertzberger's division. He retained his position and received an increase in his salary; also, Defendant offered to pay his moving expenses and to find his wife a job in the area. Based on this evidence, the Court finds that the transfer to Evansville was not an adverse employment action.

Plaintiff also claims that Defendant retaliated against him because it did not transfer him back to the Huntsville store after he left Evansville. He claims that the transfer to Bessemer required him to commute 200 miles round trip every day. The failure to transfer him back to Huntsville -- a store in Ertzberger's division, which he had requested to leave -- is not an adverse employment action. Moreover, transferring him to another store that required a longer commute is also not an adverse employment action. *Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1222 (M.D. Ala. 1999).[8]

The Court finds insufficient evidence to establish that the transfer to Evansville and

---

[8]The district court in *Smith* wrote:

> Plaintiff first contends that his longer commute to work creates various emotional problems for him because he is away from his minor children for longer periods of time. While this may be true, the court notes that Plaintiff certainly had the option to move to Montgomery and thereby avoid the longer commute. . . . In short, the court finds that Plaintiff's longer commute to work was the result of his own decision to continue living in Selma, and that this alone does not constitute an adverse employment action. *See Spring v. Sheboygan Area Sch. Distr.*, 865 F.2d 883, 886 (7th Cir.1989) (holding that a transfer that increased plaintiff's travel distance to work did not constitute an actionable adverse employment action).

*Smith*, 64 F. Supp. 2d at 1222.

the refusal to transfer Plaintiff to Huntsville are adverse employment actions. Therefore, Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's retaliation claims based on his transfer to Evansville and the refusal to transfer him to Huntsville are due to be dismissed.

### 3. Pay Issues

Plaintiff contends that Defendant retaliated against him because his paycheck was delayed when he started working at the Bessemer store, because his withholding was incorrect, and because he was never paid a Christmas bonus he claims he is owed. The Court notes that Plaintiff's pay was delayed because he started working at the end of one pay period; therefore, he got paid for this time at the next pay period. Also, Plaintiff's withholding was corrected. He also claims that he was retaliated against because he was told to talk only with Deane regarding the resolution of his pay issues;[9] however, since all pay issues were resolved, except for Plaintiff's claimed unpaid bonus, the Court finds that no reasonable person could find that having to deal with Deane adversely affected Plaintiff.

Therefore, the Court finds that Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's pay claims – except for his claim for an unpaid Christmas bonus – are due to be dismissed.

Defendant argues that Plaintiff's claim for an unpaid Christmas bonus of $21.16 is de minimis and does not satisfy the threshold of substantiality required for an adverse

---

[9]The Court notes that the evidence is undisputed that Plaintiff actually complained to numerous people regarding his pay and suffered no adverse employment action as a result.

employment action. However, the Eleventh Circuit Court of Appeals recently held:

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's *compensation*, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir.1997) (citation and internal marks omitted). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998).

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)(emphasis added).

Because the unpaid Christmas bonus is an issue directly affecting Plaintiff's compensation,

the Court finds that, although only a small amount, the unpaid bonus is an adverse

employment action. Nevertheless, the Court finds that this claim is due to be dismissed.

Assuming that Plaintiff could prove a prima facie case,[10] Defendant has articulated

two legitimate, non-discriminatory reasons for its decision -- (1) that Wynn had left the

company and therefore, forfeited his bonus; and (2) that the Huntsville store's performance

did not support a year-end bonus. Plaintiff has not presented substantial evidence that

these reasons are a pretext for retaliation. *Palmer v. Board of Regents of University

System*, 208 F.3d 969, 973 (11th Cir. 2000)("We have held that 'a plaintiff is entitled to

survive summary judgment, and judgment as a matter of law, if there is sufficient evidence

to demonstrate the existence of a genuine issue of fact as to the truth of each of the

employer's proffered reasons for its challenged action.'" (quoting *Combs v. Plantation*

---

[10]The Court pretermits further discussion of Plaintiff's prima facie case, but notes that there is no evidence that the Joanne Saunders, the person responsible for bonus to management employees, was aware of Plaintiff's protected activity.

*Patterns*, 106 F.3d 1519, 1529 (11th Cir.1997), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998))).

Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's retaliation claim based on the unpaid bonus is due to be dismissed.

### 4.    Retaliatory Harassment

Defendant contends that Plaintiff's alleged retaliatory harassment is not sufficiently severe or pervasive to support a cause of action. In order for harassment to be actionable it must be "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999)(en banc), *cert. denied*, ___ U.S. ___, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000 ); *Perryman v. West*, 949 F. Supp. 815, 820 (M.D. Ala. 1996)([T]his court finds that it is not sufficient, for a finding of an adverse employment decision, merely to find that harassing remarks were made, but rather, there must also be a finding that those remarks altered a term or condition of employment by either affecting work performance or by creating a hostile environment.")

The Court finds that Plaintiff's allegations of harassment are insufficient to support a finding that a reasonable person would have perceived the workplace as hostile due to acts of retaliatory harassment. The actions alleged by Plaintiff[11] are simply not severe enough or pervasive enough to satisfy his burden. *Gupta*, 212 F.3d at 583-84. Therefore, the Court finds that Defendant's Motion for Summary Judgment is due to be granted and

_____

[11]*See* Doc. 46, Argument, pp. 7-8.

Plaintiff's claim of retaliatory harassment is due to be dismissed.

### 5.    Termination

Defendant contends that Plaintiff cannot show that the reason for his termination is a pretext for retaliation. "[A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions." *Combs*, 106 F.3d at 1529.  The Court finds that Plaintiff has failed to carry his burden.

Therefore, Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's retaliatory termination claims are due to be dismissed.

### B.    NEGLIGENCE/WANTONNESS CLAIMS & RATIFICATION

Plaintiff appears to base his negligence, negligent retention, and ratification claims on Defendant's failure to prevent harassment – criminal harassment.  *See* Doc. 46, Argument, pp. 7, 8.   There is no evidence that Plaintiff was the victim of criminal harassment as defined by Alabama law.  Ala. Code 13A-11-8; *Robinson v. State*, 615 So.2d 112, 113 (Ala. Crim. App.1992); *Beech v. City of Mobile*, 874 F. Supp. 1305, 1311 (S.D. Ala. 1994)(quoting *Shinault v. City of Huntsville*, 579 So. 2d 696, 699 (Ala. Crim. App.1991) (Bowen, J., concurring); *Swann v. City of Huntsville*, 455 So. 2d 944, 950 (Ala. Cr. App.1984).

Therefore, Plaintiff's claims based on negligence, negligent retention, and ratification

are due to be dismissed.[12]

## D.    BREACH OF CONTRACT

Defendant contends that Plaintiff cannot prove that he has an employment contract with Defendant. Plaintiff argues that Defendant's anti-harassment and anti-retaliation policies give him certain rights, which – in the employment relationship – are contractual rights. Based on the statements regarding at-will status of all employees on the employment application and in the policies, the Court finds that the policies upon which Plaintiff relies simply are not sufficient to create an employment contract, giving Plaintiff a contract right not to suffer retaliation.[13] *Campisi v. Scoles Cadillac, Inc.*, 611 So. 2d 296, 299 (Ala. 1992)("this provision does not met the requirement in *Hoffman-LaRoche*, *supra*, that the language used be definite in form and specific enough to constitute an actual offer rather than a mere general statement of policy . . . . (citing *Hoffman-LaRoche, Inc. v. Campbell*, 512 So. 2d 725, 734-35 (Ala. 1987)); *see also Howard v. Wolff Broadcasting Corp.*, 611 So. 2d 307, 309-311 (Ala. 1992)(holding that FCC regulations prohibiting discrimination did not create a contractual right not to be fired on the basis of sex), *cert. denied*, 507 U.S. 1031, 113 S. Ct. 1849, 123 L. Ed. 2d 473 (1993).

Therefore, the Court finds that Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's breach of contract claim is due to be dismissed.

---

[12]The Court notes that there is no recognized, common-law tort in Alabama for retaliation because of federally-defined protected activity.

[13]As the Court has noted above, the record does not support Plaintiff's claims of retaliation.

### E. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Because the Court finds that Defendant's Motion for Summary Judgment is due to be granted and Plaintiff's claims are due to be dismissed, Plaintiff's Motion for Partial Summary Judgment is due to be denied as moot.

### IV.    CONCLUSION

For the reasons set forth above, the Court finds that Defendant's Motion for Summary Judgment (Doc. 36), as to all of Plaintiff's claims, is due to be granted.  The Court finds no existing disputed issue of material fact and that Defendant is entitled to judgment as a matter of law.  Plaintiff's Motion for Partial Summary Judgment  (Doc. 41) is, therefore, due to be denied as moot.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion granting summary judgment in favor of Defendant on all claims of Plaintiff and denying Plaintiff's Motion for Partial Summary Judgment.

DONE this 27th day of July, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

Page 34 of  34